J-S32010-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| R.E.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| B.W.B. | : | |
| | : | |
| Appellant | : | No. 177 MDA 2018 |

Appeal from the Order Entered December 29, 2017
In the Court of Common Pleas of Lancaster County
Civil Division at No(s): CI-17-09587

BEFORE:   PANELLA, J., NICHOLS, J., and PLATT*, J.

MEMORANDUM BY PANELLA, J.                    **FILED AUGUST 13, 2018**

Appellant, B.W.B. ("Father"), appeals from the order entered December 29, 2017 in the Court of Common Pleas of Lancaster County, which granted primary physical custody of the parties' children, J.W.B. (born June 2010), and J.B. (born May 2013) ("the Children"), to Appellee, R.E.B. ("Mother"), and permitted Mother to relocate to Fort Worth, Texas. We affirm.

The trial court summarized the relevant procedural and factual history, in part, as follows.

> On October 28, 2017, [Father] filed a Counter-Affidavit to [Mother's] Notice to Relocate. Mother filed a Custody Complaint and a Petition for Relocation on November 2, 2017. A hearing was held on December 20, 2017 and a Final Custody and Relocation Order, granting Mother's petition to relocate and giving Mother primary physical custody of the minor children, J.[W.]B. and J.B., was issued on December 28, 2017. Father appealed that Order on January 25, 2018.

_____

* Retired Senior Judge assigned to the Superior Court.

Mother was born and raised in Longview, Texas. N.T., 12/20/17 at 17. Father was born and raised in Lancaster County, Pennsylvania. *Id*. at 113. Both parents moved to Utah for college and met in August of 2004. *Id*. at 114. The parties married on December 28, 2005. *Id*. Upon marriage, the parties remained in Utah: Father continued with his education and Mother worked to support them. *Id*. In January of 2010, the parties moved to Lancaster, Pennsylvania, so Father could accept an internship at Lancaster General Hospital ("LGH"). *Id*. at 114. Their first child, J.[W.]B., was born in June of 2010. *Id*. at 115. In December, 2012, Father lost his job at LGH because of a sexual harassment allegation. *Id*. at 22-23. In April 2013, the parties moved back to Utah for Father to accept a job at the University of Utah. *Id*. at 22, 114. Their second child, J.B., was born a month later in May 2013. *Id*. at 115. Mother was a stay-at-home mom from 2013 to 2014. *Id*. at 23. Father once again uprooted the family in June of 2014 when he quit his job in Utah and accepted a position at Well Span in Lancaster, Pennsylvania. *Id*. at 22, 114. Father worked at Well Span one year before he quit Well Span in August of 2015 to pursue a master's degree. *Id*. Father graduated from the master's program in August of 2016 and began work at Pinnacle Health. *Id*. Father worked at Pinnacle Health for less than a year before losing his employment. Father has held his latest job for two months. *Id*. at 24, 115.

Mother has been employed with Costco Wholesale since 2006. *Id*. at 13-14. Mother is employed as a Licensed Hearing Aid Fitter on a limited part-time basis in which she works a two[-]day week, followed by a three-day week, in rotation. *Id*. at 11, 18. Mother does not receive benefits and is paid $27.25 per hour. *Id*. at 19. There are no full-time employment opportunities available to Mother at her current Costco location. *Id*. at 7. The manager of her store testified that it is rare for a full-time position to become available due to the low turn-over-rate at the company and the long list of employees interested in a full-time position. *Id*. at 8. Full-time positions are filled on a seniority basis and Mother is not very senior in her current store. *Id*. at 10. Mother has been offered a full-time position at the Costco in Southlake, Texas, where she will maintain the same position she has now but on a full-time basis. *Id*. at 12. She will make one dollar an hour

less, *[i]d*. at 14, based on Costco's cost-of-living determinations. *Id*. at 33.

Mother described her relationship with Father as emotionally abusive. *Id*. at 26. She described him as manipulating and controlling. *Id*. at 27. She said their relationship was good as long as she went along with what he wanted. *Id*. It was evident, through Father's own evidence and his testimony, that Mother's description was accurate. For instance, Father dug through the trash looking for Mother's receipts to see where she had been, kept track of her whereabouts by linking her phone to his computer, opened mail addressed solely to her, read her personal journal and searched through her other personal belongings. *Id*. at 45, 52, 56-58. He also admitted to his third affair in February of 2017. *Id*. at 25. Mother decided in March of 2017 to end the marriage. *Id*. at 24. In May 2017, after Father had not moved out as agreed to by the parties, Mother filed for divorce. *Id*. at 47.

Trial Court Opinion, 2/15/18, at 1-2 (unnumbered).

The trial court held a hearing on December 20, 2017. Both Mother and Father testified on their own behalf. In addition, the trial court heard testimony from Ron Forotini, the general manager of the Costco in Lancaster Pennsylvania; Michael Morris, the assistant general manager of the Costco in South Lake, Texas; Mother's sister; Terry Dailey, a vocational expert; neighbors S.S. and T.B.; and the Children's paternal grandmother. By order entered December 29, 2017, the trial court permitted Mother to relocate with the Children to Fort Worth, Texas.

The order granted Mother primary physical custody of the Children, and Father partial physical custody of the Children. The order provided Father partial physical custody from the first day after the end of the school year until the last day before the next school year begins. Further, Father has physical

custody from the first day to the last day of the Thanksgiving or Christmas break. Father filed a timely notice of appeal as well as a concise statement of errors complained of on appeal.

We begin with Father's challenges to the trial court's award of primary physical custody to Mother. In custody cases under the Child Custody Act, ("the Act"), 23 Pa.C.S.A. §§ 5321-5340, our standard of review is as follows.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

> [T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

In, we stated the following regarding an abuse of discretion standard.

> [W]e are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is

- 4 -

abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*M.A.T. v. G.S.T.*, 989 A.2d 11, 18-19 (Pa. Super. 2010) (*en banc*) (citations omitted).

"Our paramount concern in child custody cases is to determine the best interests of the child." *In re K.D.*, 144 A.3d 145, 151 (Pa. Super. 2016) (citations omitted). "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well[-]being." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted).

The Act sets forth the best interest factors that the trial court must consider. *See* 23 Pa.C.S.A. § 5328(a)(1)-(16). *See also J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011) (stating trial courts are required to consider "**[a]ll** of the factors listed in section 5328(a) . . . when entering a custody order.")

Father's argument regarding custody essentially sets forth the custody factors and simply asserts various factors that Father contends the trial court should have weighed differently. When considering the § 5328(a) custody factors, the weight the trial court assigned the evidence, as well as all the other factors, cannot be disturbed by this Court. *See E.D. v. M.P.*, 33 A.3d 73, 76 (Pa. Super. 2011).

In any event, the trial court thoroughly and reasonably analyzed and addressed each factor under § 5328(a):

> 1.    Neither party is more likely to encourage and permit frequent and continuing contact between the children and the other party.  No evidence was presented that communicating with the children is an issue.
>
> 2.    The children are currently safe and not at risk of harm.
>
> 2.1   Children and Youth Services has not been involved with this family.
>
> 3.    Although both parties perform parental duties on behalf of the children, as stated above, Mother is the primary caretaker including meals, laundry, medical appointments, church and school interactions.
>
> 4.    Mother provides more stability and continuity in the children's education and family life.  She engages in homework and parent teacher meetings.  Father is active with the children's sports teams and enjoys playing with them outdoors.
>
> 5.    Father has extended family residing in the area including his mother, father, aunts, uncles, and his brother and brother's family. Mother's sister resides with Mother. Mother's sister will live with her in Texas and she has a cousin in the area. Mother's mother and father live approximately two hours away and will relocate to be near Mother.   Father has no family in Texas.
>
> 6.    The children have no other siblings.
>
> 7.    The children did not testify due to their young age.
>
> 8.    Neither party has attempted to turn the children against the other party. Mother kept a calendar in her room counting down to this hearing which the children viewed. The parties residing together during this relocation and divorce negatively affects the children.

9.    Both parties maintain a loving and nurturing relationship with the children adequate for the children's emotional needs. The younger child has a closer relationship with Mother than Father.

10.    Both parties attend to the daily needs of the children but the [m]other more so.

11.    The parties currently share a residence. Mother proposes to relocate to Fort Worth, Texas.

12.    The parties rely on each other and family to care for the children.

13.    There is a moderate level of conflict between the parents which should improve when they no longer reside together. The parties do not communicate.

14.    Neither Mother nor Father ha[s] a history of drug or alcohol abuse.

15.    Neither [p]arty has a physical or [m]ental condition affecting custody.

16.    On 11/6/17[,] the parties were ordered to complete the Focus on the Children seminar within sixty (60) days. Father did so; Mother has not. Within twenty-four (24) hours Mother shall provide to Chambers[] a copy of her registration for the seminar or a similar type seminar in Texas as well as a copy of her certificate of attendance at the seminar immediately upon completion. Both parents love their children very much. But for Father's multiple and continued infidelities this family would be intact.

Trial Court Order, 12/29/17. We may not interfere with a trial court's conclusions unless they "represent a gross abuse of discretion." *Luminella v. Marocci*, 814 A.2d 711, 716 (Pa. Super. 2002) (citation omitted). That is simply not the case here.

We next consider Father's issues concerning relocation. The party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child. **See** 23 Pa.C.S.A. § 5337(i)(1). The trial court must consider the ten relocation factors set forth within § 5337(h) of the Act. **See id**., at 81-82 ("Section 5337(h) mandates that the trial court *shall* consider all of the factors listed therein, giving weighted consideration to those factors affecting the safety of the child.")

In its order, the trial court weighed the custody and relocation factors as follows.

1. Mother is the primary caretaker of the children. Father has a fun, enjoyable relationship with the children but it has been Mother who primarily takes care of the children's daily needs; including routine and schedules, attends to their school work, and provides emotional stability. The children have a close relationship with their paternal grandparents. Mother wishes to relocate to be closer to her extended family where she was born and raised plus has a better job opportunity.

2. The children are doing well in their current school. Given the young ages of the children, changing schools would not be detrimental to their education. Also, the children have experienced moving in the past. The family has moved several times across the country to accommodate Father's education and employment opportunities including twice to Lancaster, Pennsylvania, from Utah. Father has had four positions in Lancaster and recently found a job again as a medical practice manager. (He lost one job due to a sexual harassment allegation).

3. The relocation would create a twenty-two [] hour[-]driving distance between the parties. Given the distance and limited financial means of the parties, a relocation will reduce custody for Father. Both parties would need to commit to making communication and visitation a priority.

4. The [c]ourt did not speak to the children given their young age.

5. Both parties encourage the children to have a relationship with the other parent.

6. The relocation would greatly enhance Mother's life. Mother has been a part-time employee of eleven years for Costco, Inc. Mother enjoys working for the company and is valued by the company in return. Currently, Mother holds a part-time position where working an average of twenty-five (25) hours per week. If Mother relocates, she will be a full–time employee earning more income and better benefits. Father's employment history has been unstable. Mother's full-time employment will provide financial stability for her and the children. The relocation would allow Mother to return to the place she grew up. She would have family members and friends in the area to lend her support. Only Father has family in Lancaster County. The relationship between Mother and Father fractured due to Father's three affairs. Mother has no family in the Lancaster area besides her sister who will relocate with her.

7. Despite the fractured relationship of the parents, they continue to live in the same home as roommates. This living arrangement has been stressful. Mother stated the marriage only worked when she acquiesced to Father's wishes. Father has opened and read mail addressed to Mother, tracked her whereabouts using her cellular phone and has read her personal journal. Both parents have refused to move out of the marital home. The current living arrangement is toxic to the children. The relocation will not only benefit the children by them no longer residing in a toxic environment but they will also benefit by having a Mother who is stable, healthy, and independent.

8. Mother's reasons for wanting to relocate are to be closer to her home, family, friends, and better employment opportunities. Father's main objection to relocating is that he doesn't know anyone in Texas. He was born and raised in Lancaster. His family lives here, but asking Mother to remain in Lancaster causes the same situation for her, which she has done twice.

9.     No evidence was presented that either party physically abuses the other or abuses the children. Both parties claim they have been emotionally abused by the other.

10.     Father's vocational expert did not receive communication from Costco regarding Mother's work history and future job. There is no guarantee Mother could secure a job in the Lancaster area similar to the income and benefits she will receive with her job offer in Texas. The expert did not know what Mother's income and benefits will be when Mother passes her certification in Texas versus her present situation. Father has an unstable work history and could end up relocating again to find work[,] however Father's expert did not address these issues.

Father participates in outside activities with the children while Mother does inside activities with the children. Mother is the disciplinarian and provides more structure and nurture.

Trial Court Order, 12/29/2017.

And in its Rule 1925(a) opinion, the trial court further explained:

The [c]ourt considered the ten relocation factors in reaching its decision per 23 Pa.C.S.A. §5337. … The [c]ourt found Mother to be a credible witness. Father less so. For instance, Father testified that maternal grandfather never came to visit them in Pennsylvania but later indicated that maternal grandfather had visited twice. [N.T., 12/20/17] at 125. Father testified that Mother never expressed an interest in moving back to Texas, yet he applied for a job in Texas upon completion of his undergraduate degree, [*i*]*d*. at 142, which leads the [c]ourt to believe that a move had been considered.

Mother's life would improve with her move to Texas. She would benefit financially by her new position in Texas. Mother is currently working on average twenty-five (25) hours a week. *Id*. at 18. Mother's current hourly rate is twenty-seven dollars and fifty cents ($27.50) an hour and grossing approximately six hundred eighty-seven dollars and fifty cents ($687.50) a week. *Id*. at 19. Mother's position upon relocation pays twenty-six dollars and fifty cents ($26.50) an hour for forty (40) hour per week. *Id*. at 9, 33. Mother's gross weekly salary upon relocation is one thousand sixty

- 10 -

dollars ($1060). Mother will therefore be grossing three hundred and seventy-two dollars and fifty cents ($372.50) more a week, which means a yearly increase of nineteen thousand three hundred and seventy dollars ($19,370). This is clearly a financial benefit. Additionally, she will be able to continue with the same employer she has worked for since 2006, working in a job she enjoys. In Texas, she will be promoted to a full-time position including benefits. *Id*. at 63. This will greatly increase Mother's quality of life. Mother will be receiving other benefits such as health insurance[,] which is an added benefit to Mother and the children given how frequently Father changes jobs.

Father presented a vocational expert who claimed that the area Mother is moving to has a higher cost-of-living. *Id*. at 87. However, Mother testified that the reason she is being paid one dollar less per hour by Costco is because that area has a lower cost-of-living. *Id*. at 33. Mother testified that passing her hearing aid fitters exam was not a concern. *Id*. The [c]ourt believes Mother's assessment and Father presented no evidence to sway the [c]ourt otherwise. The [v]ocational expert also testified that Mother could find a comparable position locally to the one she was offered in Texas. The [c]ourt was not persuaded by the vocational expert who presented a generic listing of jobs without any specifics as to the duties, hours and benefits of those jobs nor any testimony specific to Mother being able to obtain those jobs. *Id*. at 85. Also, the expert's credibility was lessened when the expert never spoke to Mother's current employer, never spoke to anyone in the Texas store about Mother's new position, nor did she do any analysis of Mother's earnings once she becomes licensed in Texas and obtains her expected hourly wage. *Id*. at 92, 94.

Mother's life would improve with her move to Texas because she would benefit emotionally. Mother was credible when she described her relationship with Father was good as long as she went along with everything Father wanted. *Id*. at 27. She testified that Father was manipulative and controlling. *Id*. Mother not only testified to this[,] but Father admitted to controlling and manipulative behavior[,] but did not/could not acknowledge that behavior as a problem. He admitted he tracked Mother's whereabouts by her phone, "but not that often". *Id*. at 144. He admitted he read her personal journal. *Id*. at 143. He presented her mail, that he had opened, on cross examination of the

[m]other. *Id*. at 52. After Father's third affair and dissolution of the marriage, Mother needed to relocate for family and full-time employment. *Id*. at 38. Mother's only support is her sister who moved in with Mother two months ago but would move to Texas to reside with Mother and the boys. Mother is able to reconnect with family and friends and receive support in Texas. Mother has a very close relationship with her sister and parents. All were present at the courthouse the day of the hearing. Her sister put her life on hold to come to Lancaster to give Mother support as her marriage dissolves. *Id*. at 75. Sister plans on obtaining employment around Mother's schedule to help with childcare. *Id*. at 72. The [c]ourt does not believe the 1 1/2-2 hour distance between Mother and maternal grandparents will be a barrier, plus maternal grandparents will move closer to Mother. *Id*. at 64.

In addition to Mother's life improving, the children's lives will also improve. Besides the benefit to having a happy, healthy, independent mother, the children will also derive their own direct benefits from the move. Both parents testified that the public school the children are assigned to is not adequate to meet the parents' educational expectations. *Id*. at 28, 119. The parents currently have the children enrolled in a local nonpublic school. Both parents testified that this is a financial strain for them and have been in conversations with the school about their inability to pay. *Id*. at 29, 55, 138-139. If an agreement [on] tuition is not reached, the children will need to attend the public school that the parents have jointly decided is not in the children's best interest. Upon relocation, the children will be enrolled in a highly regarded public school which has many enrichment and afterschool activities at no cost to the parents. *Id*. at 36.

Adequate substitute partial custody arrangements could be made to preserve the relationship between Father and the children when granting relocation. Father will have the children all summer[,] which coincides with Father enjoying outside activities with the boys. *Id*. at 96. Also, Mother is very supportive and encouraging of the boys' relationship with their Father. *Id*. at 40. Furthermore, Mother credibly testified that the eldest child has taken on an emotional caretaker role of Father because of Father's grief over the breakup of the marriage. *Id*. at 67. The eldest child needs to be a child[,] not ... Father's counselor.

The [c]ourt found Mother more credible when she testified that she was the primary caretaker of the children. Mother testified that Father was not around much prior to the separation. *Id*. at 42. Since the separation, Father has begun to do more for the boys, however[,] Mother primarily takes care of the children's daily needs, including routines and schedules, attends to their school work, provides emotional[] stability, cooks their meals, prepares them for school in the morning, attends their parent/teacher conferences, washes the laundry, handles their medical appointments, and attends to their church and school activities. *Id*. at 30. Father[] also plays basketball up to three nights a week. *Id*. at 118. The [c]ourt did not find the testimony of the two neighbors persuasive as they never saw any interactions between Mother and the children as opposed to seeing Father play with the children outside. *Id*. at 96, 102.

Father argued Mother's real motive to move was a relationship with a gentleman in Texas. Father, after invading Mother's privacy and reading, copying and disseminating her private writings, decided that she was pursuing a relationship in Texas. Mother was believable when she emphatically denied being in a relationship with anyone in Texas. *Id*. at 58. The gentleman Father mentioned is a childhood friend who is presently engaged to marry someone else. Mother's most credible statement was when she testified, "Now, I'll tell you right now, I am not moving to Texas for a guy. I have moved across the country three times for a guy, and I will never do it again." *Id*. Mother met her burden of proving the need for her to relocate and her relocation is in the best interests of the children.

Trial Court Opinion, 2/15/18 (unnumbered 2-5).

Father's eight issues concerning relocation overlap. At their core, the issues dispute the trial court's findings of fact and determinations regarding credibility and weight of the evidence. Under the aforementioned standard of review applicable in custody matters, the trial court's findings of fact and determinations regarding credibility and weight of the evidence are not

disturbed absent an abuse of discretion. As we stated in *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005):

> It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, giv[ing] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion. . . .

(quoting *Hanson v. Hanson*, 878 A.2d 127, 129 (Pa. Super. 2005)).

We briefly explain why Father's issue have no merit. Father takes issue with the trial court's assertion Father lost one of his jobs due to sexual harassment, arguing, "there is no evidence of Father losing his job because of sexual harassment." Father's Brief, at 51. However, Mother testified, "I know what [Father] told me. There was a sexual harassment filed -- case filed against him." N.T., 12/20/17, at 23.

Father also asserts that the trial court improperly found Mother would benefit financially from the move to Texas, asserting there "was no comparison to Mother's **actual** earnings in Lancaster to her proposed earnings in a fulltime position in Texas…" Father's Brief, at 32. He also asserts that the trial court erred because his vocational expert testified that Forth Worth, Texas has a higher cost of living than Lancaster and that the benefit would be offset by the cost of travel.

Mother testified that she began looking to relocate to Texas when Father lost his job at Pinnacle because she did not believe Father was stable. **See** N.T., 12/20/17, at 47-48. Mother located a position at Costco in Texas that

would offer full-time employment. There is no full-time position available in the Lancaster store. *See id*., at 7. Initially, Mother would earn $23.25 an hour but she would earn $26.25 an hour after receiving her Texas license. *See id*., at 33. Costco pays less because of the cost of living in Texas. *See id*. Mother will work forty hours per week, and the job includes benefits. *See id*. at 63. In Pennsylvania, Mother earned $27.25 an hour for part-time work. *See id*. at 19. Because she was "limited part-time," she worked 40 hours every two weeks, although she had opportunities to pick up additional time. *Id*., at 18-19. The trial court credited this testimony to conclude that Mother would experience a substantial economic benefit from the move to Texas.

Father argues that the trial court committed an error of law and an abuse of discretion by placing the burden of proof on Father to establish his potential earnings in Fort Worth, Texas. Father also asserts that the trial court did not find his vocational expert credible because she did not perform an assessment of Father's earning capacity in Texas.

The trial court's order states:

10.    Father's vocational expert did not receive communication from Costco regarding Mother's work history and future job. There is no guarantee Mother could secure a job in the Lancaster area similar to the income and benefits she will receive with her job offer in Texas. The expert did not know what Mother's income and benefits will be when Mother passes her certification in Texas versus her present situation.  Father has an unstable work history and could end up relocating again to find work[;] however[,] Father's expert did not address these issues.

Trial Court Order, 12/29/17 (unnumbered at 3).

- 15 -

Contrary to Father's argument, the trial court did not place the burden on Father to prove his earning capacity in Texas. Rather, the trial court faulted Father's vocational expert for failing to communicate with Costco, and for failing to determine Mother's income and benefits in Texas. The trial court did not fault his expert for failing to determine Father's income potential in Texas.

Father asserts the trial court erred by concluding Mother would have more family support in Texas. However, Mother testified that her sister will move with her to Forth Worth, and her parents live 175 miles away and are willing to move to Dallas/Fort Worth to assist her. **See** N.T., 12/20/17, at 64. Further, Mother's cousin lives in the area. Mother has no family in Pennsylvania. **See id**., at 38.

Father also claims that the trial court failed to give "sufficient weight" to Mother's purported romantic interest in a "male friend" in Texas. Father's Brief, at 49. Father relies on portions of Mother's journal that Father discovered when he moved her lunchbox from the stove. He testified that it felt heavier so he opened it, discovered Mother's journal, and found "pages of her communication and contact with this gentleman." N.T., 12/20/17, at 143. The journal includes dates and three entries that Father asserts show Mother wishes to relocate because of this romantic interest. **See id**., Defendant's Exhibit 7. Father's counsel used the journal entries to cross-examine Mother, who testified that the man is a family friend she met when she was 14 years old who is engaged to someone else. **See id**., at 58. Mother testified, "[n]ow,

I'll tell you right now, I am not moving to Texas for a guy. I have moved across the country three times for a guy, and I will never do it again. And no, I'm not in a relationship with him." *Id*. at 58-59. The trial court found Mother's testimony believable.

Father similarly assails the trial court's findings regarding the respective schools in Lancaster and Fort Worth, the trial court's determinations regarding who provided care for the Children, who took the Children to church and activities, as well as its conclusions regarding the availability of alternate arrangements for custody, the weight to be given to the Children's need for stability and continuity, and the impact the relocation would have on the Children. Father, in essence, questions the trial court's conclusions and assessments and seeks this Court to re-find facts, re-weigh evidence, and/or re-assess credibility to his view of the evidence. This, as we explained, we cannot do.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/13/18